■ CHEMICAL BANK et al., Respondents, v FLUSHING SAVINGS BANK, Appellant.—Order and judgment, Supreme Court, New York County (Walter Schackman, J.), entered on or about May

18, 1988 and entered June 6, 1988, respectively, granting plaintiffs' motion for partial summary judgment in the amount of $1,487,677.90, unanimously reversed, on the law, and the motion for partial summary judgment denied and the judgment vacated, with costs.

Plaintiffs, three of the participants in a construction loan agreement, challenge certain expenses and interest on expenses deducted from their pro rata shares of the loan proceeds by the defendant, a participant in the agreement and lead lender. This appeal raises the question of whether considering the language in the loan agreement, material issues of fact exist sufficient to warrant denial of summary judgment as to the parties' intention with respect to the payment of expenses incurred in protecting the loan and the payment of interest on those expenses.

On August 26, 1976 plaintiffs, Chemical Bank (hereinafter Chemical), the Lincoln Savings Bank, FSB (hereinafter Lincoln), and Mortgagee Affiliates Corp. (hereinafter Mortgagee Affiliates) together with the defendant Flushing and others entered into a participation agreement (hereinafter the agreement). Pursuant to the agreement each of the parties contributed to a $14 million construction loan mortgage to Parr Meadows Racing Association (hereinafter Parr Meadows) to complete construction of a racetrack in Yaphank, New York. Chemical contributed 23.21%, Lincoln 10% and Mortgagee Affiliates 16.30%. Flushing contributed 10% and acted as lead lender, receiving a "packaging fee" of $280,000.

Pursuant to paragraph 6 of the participation agreement, Flushing was to reimburse itself for out-of-pocket expenses secured by the mortgage from moneys paid by the borrower on the note. The other lenders were only to contribute their share of the loan principal. Paragraph 6 provides in relevant part as follows: "Except as hereinafter expressly provided, all sums which shall be received by Flushing Savings, in payment of any interest, principal, late charges, prepayment premiums or otherwise in respect of the Mortgage (excluding any out-of-pocket expenses secured by the Mortgage which Flushing Savings shall have made and be entitled to recoup) shall be distributed, at least once a month, to each of the Participants to the extent of its proportionate share. However, as is provided in the Mortgage and Agreement, the Contractor Participants are not entitled to receive any payments of interest in respect of their proportionate shares until and unless there shall be a default in the terms of any of the Loan Documents, such default to be determined solely at the discretion of

Flushing Savings; and in such event said interest shall accrue only from the date of default."

Also, on August 26, 1976 the loan participants entered into a buy-sell contract with Lincoln whereby Lincoln agreed to "take-out" the other construction lenders by purchasing the loan, at its face value of $14 million on or before June 30, 1977. Lincoln's obligation after purchasing the loan was to enter into a 10-year mortgage with Parr Meadows to replace the construction financing with permanent financing.

The construction was finished and the racetrack opened prior to June 30, 1977. However, Lincoln refused to purchase the loan and mortgage as agreed. The borrower, Parr Meadows, soon afterwards defaulted and filed for bankruptcy.

Thereafter, Flushing, on behalf of itself and the other loan participants, commenced actions against Lincoln and the American International Group (hereinafter the AIG companies), a consortium of insurance companies which had guaranteed the note to the extent of $4 million, seeking specific performance by Lincoln and recovery from the AIG companies. These actions were consolidated along with a third case in which the AIG companies sought a declaratory judgment relieving them from liability under their financial guarantee bond (hereinafter the Lincoln/AIG litigation).

Following trial in Supreme Court, New York County (Edward Greenfield, J.), judgment was entered on November 17, 1983 in favor of Flushing (a) directing Lincoln to specifically perform the buy-sell agreement; (b) directing the AIG companies to pay $4 million plus interest on the bond to Flushing; and (c) directing Lincoln to pay to Flushing (i) the purchase price of the construction mortgage, plus interest, less the amount collected from the AIG companies and (ii) compensatory damages for certain expenses[1] incurred by it in preserving the property and in protecting the interest of the loan participants, plus interest from June 30, 1977. Of the total $25,829,056.39 awarded to Flushing, $22,705,148.83 constituted loan principal and interest. Some $2,170,963.32, on the other

---

1. The expenses which Flushing recovered pursuant to the Lincoln/AIG judgment were for expenses in upholding the validity of the mortgage in bankruptcy proceedings and in protecting the physical property secured by the mortgage. These costs included real estate taxes, insurance, utilities, security services at the property, winterizing and repairs, architectural inspection and testimony fees related to the bankruptcy proceedings, title searches, judicial sale advertising, water service, participants' meetings, and court reporter and legal fees incurred on the bankruptcy proceedings. (Findings of fact, Justice Greenfield, Nov. 9, 1983.)

hand, was in the form of damages to Flushing for out-of-pocket expenses. The total interest on these expenses was set at an additional $952,944.24. Flushing did not recover the legal fees and other disbursements incurred in prosecuting the eight-year-long litigation against Lincoln and the AIG companies. This court affirmed Lincoln's appeal from the judgment, without opinion, and the Court of Appeals denied leave to appeal. (*American Home Assur. Co. v Flushing Sav. Bank,* 104 AD2d 1059 [1984], *lv denied* 64 NY2d 606 [1985].)

After payment of the judgment to Flushing in February 1985, plaintiffs demanded from Flushing an accounting of the distribution of the judgment proceeds to the loan participants. On April 25, 1985 Flushing provided the loan participants with an accounting in which it conceded that of the $25,829,056.39 judgment, plaintiffs collectively were entitled to a share of the recovery totaling $8,625,175.92. However, Flushing's accounting deducted from this amount what Flushing determined to be plaintiffs' pro.rata shares of Flushing's total expenses (including those for which it had not been reimbursed by the Lincoln/AIG judgment) plus interest at the prime rate plus 2.5%, after recognition of those expenses awarded by the court at the legal rate of interest. These unreimbursed expenses were determined by Flushing to be $2,831,110.16 plus $2,169,802.90 in interest from 1977 for a total of $5,000,913.06.

Flushing justified the interest on expenses on the ground that the failure of the loan participants to reimburse it for these expenses upon demand, as they were paid since 1977, allowed those participants to use moneys due Flushing for other investment purposes while depriving Flushing of that same opportunity.

Of the claimed unreimbursed expenses, $835,000 were labeled "projected expenses" and include: $300,000 to Shea & Gould, Flushing's attorney in much of the foregoing litigation; $25,000 to Jessel Rothman, Esq. in anticipated legal fees; $75,000 to Merritt & Harris, an engineering firm, for legal fees incurred by it when named by Lincoln as a party in the underlying litigation; $65,000 to Feldesman, Esq. an attorney who appeared as a witness in the Lincoln/AIG litigation; and $390,000 to Flushing in administrative costs from 1977, including officers' salaries.[2]

In June of 1985 plaintiffs commenced the instant action in

---

2. The remaining expenses relate to maintenance of the racetrack and assorted legal expenses, and are not a part of this appeal.

Supreme Court, New York County, seeking redress from Flushing's accounting. Following commencement of this litigation Flushing paid Chemical and Lincoln the amounts of their shares of the Lincoln/AIG judgment less the disputed expenses and interest.[3] Plaintiff's essentially challenge two aspects of Flushing's accounting, first, its withholding of interest payments on expenses and, secondly, the "projected expenses".

In March 1988 plaintiffs moved for partial summary judgment to recover (a) their collective $1,074,269.40 share of the interest on Flushing's expenses and (b) their collective $413,408.50 share of "projected expenses". By an attorney's affidavit[4] in support of summary judgment, plaintiffs contend that the agreement "clearly contemplated that Flushing would defray any appropriate out-of-pocket expenses and would recoup those expenses out of mortgage payments or other receipts (here, the [1983] Judgment [of Justice Greenfield]) before making required distributions to the participants." They argue that as an interest rate charge is not provided for in the participation agreement, Flushing is not entitled to one and that, even if such a charge were stated in the agreement or mandated by law, it is limited to the judgment rate of 9%.

Citing paragraph 6 of the participation agreement, plaintiffs' attorney further claimed that each of Flushing's "projected expenses" is improper. Characterizing the proposed $300,000 earmarked for Shea & Gould as a bonus, since the firm had already been paid $400,000 for its services, plaintiffs contend that the money cannot be paid over their objection. The estimated fee to Rothman was attacked on the ground that he had already been paid $550,000 for services which terminated upon payment of the judgment. Plaintiffs maintained that Feldesman testified at the Lincoln/AIG trial as a "fact" witness and hence his fee is illegal. Movants argued that the payment to Merritt & Harris was also improper since as a party to the litigation it should be expected to bear its own legal costs. Plaintiffs charged that as none of the proposed expenses constitute "the out-of-pocket expenses secured

---

3. It paid Mortgage Affiliates its pro rata share, less an additional $750,000. Some $250,000 of this amount was diverted to Shea & Gould under an alleged lien held by the firm, which lien is the subject of a separate proceeding in Supreme Court, New York County. Another $500,000 was withheld as security for expenses at issue in this action.

4. Attached to the affidavit of plaintiffs' attorney were copies of the complaint, answer, reply, participation agreement, and portions of Flushing's accounting.

by the mortgage" referred to in paragraph 6 of the agreement, that no question of fact exists as to Flushing's alleged right to receive payment for these expenses.

By decision dated April 20, 1988, Justice Schackman granted partial summary judgment to plaintiffs, awarding them $1,487,677.90 plus interest from February 1985. The IAS court noted that defendant never identified a contractual provision which supports its retention of the interest charges and projected expense. The motion court concluded that in the absence of express language in the participation agreement that Flushing should receive reimbursement on an ongoing basis or that interest should be paid on advances made on behalf of the loan participants, such payments must be denied as a matter of law.

We reverse for several reasons.

First, the participation agreement does not provide a clear and unambiguous answer to the intention of the loan participants with respect to the payment of expenses upon default by either the borrower or the take-out lender. Thus, a material issue of fact exists as to the intention of the loan participants in such instance, which issue cannot be decided as a matter of law.

When, as in the case before us, the intent of the parties to a contract is not clear from the language of the contract itself but must be determined by disputed evidence or inferences outside of the written agreement, we have not hesitated to deny or to reverse a grant of summary judgment. *(Janos v Peck,* 21 AD2d 529 [1st Dept 1964], *affd* 15 NY2d 509 [1964]; *Dunn v WPOP, Inc.,* 38 AD2d 817 [1st Dept 1972]; *Universal Ltd. v Stern & Co.,* 34 AD2d 770, 771 [1st Dept 1970]; *see also, Village Sav. Bank v Caplan,* 87 AD2d 145, 149 [2d Dept 1982].)

Secondly, we address Flushing's claim that it is entitled to interest on its expenses, even if plaintiffs had no obligation to reimburse Flushing for expenses on an ongoing basis.

Our courts have long implied interest on contracts arising in a commercial setting. *(See, Gillet v Van Rensselaer,* 15 NY 397, 399 [1857].)* The Court of Appeals in *Woerz v Schumacher* (161 NY 530, 534 [1900]) stated that interest can be allowed "by virtue of some contract, express or *implied,* or by virtue of some statute, or on account of the default of a party liable to pay when it is allowed as damages for the default. This, no doubt, is the general rule both in law and equity." (Emphasis in original.) However, the court in announcing this rule added: "But this rule, like almost every other general rule, is not

without some exceptions; and even within the limits of the rule who can outline with perfect accuracy the various contracts and obligations not providing for interest in express terms, but where the right to interest is to be implied?" *(Supra,* at 534; *see, New York State Thruway Auth. v Hurd,* 25 NY2d 150, 157 [1969], discussing *Woerz v Schumacher, supra,* and the development of this rule.)

Thereafter, in *Rodgers v Clement* (162 NY 422 [1900]), the Court of Appeals addressed an issue similar to the one before us. Therein, the parties formed a partnership, without writing, pursuant to which one partner advanced moneys for pursuit of a common business. In a subsequent dispute, that partner sought interest on these moneys. Concluding, based upon findings of a Referee after trial, that the parties had agreed to consider the advances as loans rather than as contributions to capital, the court stated: "[plaintiff] stands upon the same footing as any other creditor with respect to the right to be allowed interest upon the accounting. * * * *the general rule is to allow interest upon the advances, although there was no express agreement by the firm to pay it, in the absence of some agreement to the contrary, express or implied. The right to interest, or an agreement to pay or allow it, is to be implied in such cases without any express promise,* as in like transactions between parties holding no partnership relations to each other" (162 NY, *supra,* at 425-426 [emphasis added]).

This reasoning similarly was employed in *New York State Thruway Auth. v Hurd* (31 AD2d 563 [3d Dept 1968], *affd* 25 NY2d 150, *supra).* In that case, the Court of Appeals rejected defendant State's claim to interest payments wherein that issue previously had been hotly debated by the parties over an extended period of time. In fact, other contracts between the two expressed plaintiffs' doubts that interest charges could validly be imposed. The court affirmed the denial of such interest. However, Justice Breitel writing for the court, in discussing *Rodgers v Clement (supra),* noted that the general rule set forth in *Rodgers* reflected the court's "recognition that the commercial context of the transaction might supply the necessary implication of interest" where there is neither an expressed agreement to pay interest nor an agreement to the contrary, whether expressed or implied. *(New York State Thruway Auth. v Hurd,* 25 NY2d, *supra,* at 158.)

The parties involved herein are banks and financial institutions. As such, they are involved in the quintessential commercial business of lending money for profit. Moneys which such an institution does not pay out in expenses may be

invested in the expectation of reaping a generous return. Arguably, therefore, not only might the defendant be entitled to recover interest as implied by the commercial nature of the participation transaction, but might also recover interest as an element of damages if it can be established that plaintiffs wrongfully refused to reimburse defendant for its expenses on an ongoing basis, as alleged in defendant's counterclaim.

In light of the ambiguity of the participation agreement with respect to the parties' obligations for expenses in the event of default and the commercial context of their relationship, material questions of fact exist regarding, *inter alia,* (1) the intention of the parties as to payment of expenses in the event of default and the manner in which reimbursements were to be made; and (2) whether the custom and practice in mortgage loan participations in New York requires payments of a proportionate share of expenses by all participants as expenses are paid. Principals of equity and fairness also may require compensation to Flushing for lost profits while protecting the interests of all loan participants.

Finally, although Flushing does not extensively address the award of summary judgment on the challenged proposed expenses, we reverse the award of summary judgment on this issue as well. Plaintiffs' offer of proof on the summary judgment motion, that these expenses did not come within the expenses contemplated by paragraph 6 of the agreement, was minimal. Concur—Kupferman, J. P., Ross, Rosenberger and Smith, JJ.